

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-28-2005

# Molano-Paz v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 04-4320

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

Recommended Citation

"Molano-Paz v. Atty Gen USA" (2005). *2005 Decisions.* Paper 42.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/42

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

———

No. 04-4320

———

JORGE MOLANO-PAZ; JUDITH GUTIERREZ-GARCIA;
FRANCISCO JAVIER GUTIERREZ;
DIEGO ALEJANDRO GUTIERREZ,

Petitioners

v.

\*ALBERTO R. GONZALES,
ATTORNEY GENERAL OF THE UNITED STATES,

Respondent

\*(Substituted pursuant to Fed. R. App. Rule 43(c))

———

Petition for Review of the Order
of the Board of Immigration Appeals
(A96-241-213, A96-241-214,
A96-241-215 and A96-241-216)

———

Argued October 24, 2005

Before: SLOVITER and FISHER, Circuit Judges
and THOMPSON, District Judge\*\*

(Filed December 28, 2005)

———

_____

\*\*    Hon. Anne E. Thompson, United States District Judge for the District of New
Jersey, sitting by designation.

Regis Fernandez     (Argued)
18 Green Street
3rd Floor
Newark, New Jersey 07102


Attorney for Petitioner


Peter D. Keisler
Janice K. Redfern
Linda S. Wernery
United States Department of Justice
Senior Litigation Counsel
Office of Immigration Litigation
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044

Gretchen M. Wolfinger
Paula K. Speck
United States Department of Justice
Tax Division
P.O. Box 502
Washington, D.C. 20044

Asheesh Agarwal     (Argued)
United States Department of Justice
Appellate Section
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530


Attorneys for Respondent

OPINION


SLOVITER, Circuit Judge.

Jorge Molano-Paz and his wife, Judith Gutierrez-Garcia, appeal the denial of their

application for asylum, withholding of deportation, and protection under the United Nations Convention Against Torture ("CAT"). The Board of Immigration Appeals ("BIA") affirmed without opinion the decision of the Immigration Judge ("IJ") denying the applications of Molano-Paz, his wife and their two minor children for asylum, withholding of removal and protection under the CAT. We have jurisdiction to review the BIA's decision pursuant to 8 U.S.C. § 1252(a)(1). See Abdille v. Ashcroft, 242 F.3d 477, 482 (3d Cir. 2001). Where, as here, the BIA has not written its own opinion but rather has deferred to or adopted the opinion of an IJ, we review the decision of the IJ as the final agency decision. Leia v. Ashcroft, 393 F.3d 427, 433 n.1 (3d Cir. 2005); Dia v. Ashcroft, 353 F.3d 228, 243 (3d Cir. 2003) (en banc).

## I.

### Background

Molano-Paz, Gutierrez-Garcia, and their two children are natives and citizens of Colombia. Molano-Paz entered the United States on a tourist visa on February 27, 2002. His wife and children followed on June 13, 2002. Molano-Paz and Gutierrez-Garcia are both dentists. They lived and worked in the city of Armenia in Colombia until an earthquake destroyed their home and offices in 1999. Following the earthquake, they relocated to the city of Orito in Putumayo province, where Molano-Paz's brother lived. They took jobs as dentists – he at a local hospital, she in private practice.

Molano-Paz testified to the following facts: The hospital at which he worked

3

sponsored Health Brigades, sending physicians and other medical personnel into rural areas and small villages on the weekends to provide services for the indigent. Molano-Paz and Gutierrez-Garcia participated in this program. In September 2001, while working with the Health Brigades, Molano-Paz was abducted by heavily armed members of a rebel group, the FARC.[1] Molano-Paz was led through the jungle for a few hours to a rebel camp, where he was detained for a period of three days and compelled to provide dental services to the rebels. When the rebels released him, they warned him to continue participating in the Health Brigades, ordered him to remain in the area, and said that they would come for him again.

Upon his return to Orito, he sought medical treatment from his brother, who is a physician, for bruises, dehydration, stress, and exhaustion.[2] He testified, however, that his medical condition was due to the difficult journey he had been forced to take and not to any injury or violence he had suffered at the hands of the rebels. On his brother's advice he did not report the abduction to the authorities in Orito. Gutierrez-Garcia

---

[1] There are inconsistencies in the record with respect to the month and year in which the alleged kidnapping took place. Molano-Paz testified to the IJ that the kidnapping occurred on September 16, 1999. He later testified that it happened in February of 2000 and, alternately, on September 16, 2000. Gutierrez-Garcia's affidavit, which was appended to the third of the couple's three asylum applications, states that it occurred on September 16, 2001.

[2] The documentation of the treatment Molano-Paz submitted was a medical report signed by his brother and dated September 19, 2001.

4

stopped working in the Health Brigades altogether, but Molano-Paz continued his participation, even after quitting the hospital and entering private practice, because he was afraid to disobey the rebels' order. Molano-Paz was not abducted again by the FARC after the September incident.

Molano-Paz received an anonymous phone call on October 30, 2001, ordering him to stop working for the FARC.[3] He subsequently received more calls, with increasing frequency. The callers identified themselves as members of a government-aligned paramilitary group called the AUC. The AUC's threats culminated in January 2002 in Molano-Paz's receipt of a symbolic "condolence package" expressing sympathy for his "death" and ordering him and his family to leave town within twenty-four hours.[4] Gutierrez-Garcia stated she burned the package to keep the children from seeing it.

---

[3] There are inconsistencies in the record with respect to the date on which Molano-Paz allegedly began receiving calls from the AUC. He first testified to the IJ that he began receiving calls on October 30, 1999. He then testified that the correct date was October 30, 2000. His affidavit, which was attached to his third asylum application, states that the calls began on October 30, 2001. Gutierrez-Garcia's affidavit also sets the date at October 30, 2001. When Molano-Paz was interviewed in February 2003 by an asylum officer, he told the officer that the calls began in December 2001.

[4] There are inconsistencies in the record with respect to the date on which Molano-Paz allegedly received the "condolence package." He first testified to the IJ that it was received on January 10, 2002. He then testified that the correct date was actually January 2001. The affidavit he attached to the third application initially contained the date of January 10, 2001, but he modified it – immediately prior to the hearing – to say 2002. His wife's affidavit gives the date of January 10, 2001.

5

Molano-Paz left Orito with his family the next day and traveled to the town of Puerto Asis to stay with an aunt. While in Puerto Asis, Molano-Paz contacted a friend, a physician who had provided services for the AUC, and prevailed upon him to convince the AUC that Molano-Paz was not in league with the FARC. The friend reported back that Molano-Paz had been blacklisted as a FARC sympathizer and could be killed at any time.[5] Following this revelation, Molano-Paz filed a complaint with local authorities stating that he had been forced to leave Orito. He did not include in the complaint what his friend told him about the blacklisting, nor did he identify the AUC as the source of the threats he had reportedly received.

Less than a week later, Molano-Paz and his family left Puerto Asis and returned to Armenia, where they stayed at Gutierrez-Garcia's brother's house. They reported that they did not leave the house because the town was controlled by the government and the paramilitary, and they feared for their lives. During their time in Armenia, they were not contacted by the FARC or the AUC, and the children attended school without incident.

On January 23, 2002, Molano-Paz and Gutierrez-Garcia went to the United States consulate for an interview to obtain tourist visas, for which they had applied almost two years earlier. They intended to visit another of Gutierrez-Garcia's brothers who had

---

[5] Molano-Paz testified that after arriving in the United States, he asked his friend to provide a letter or affidavit confirming that the friend's contacts in the AUC had identified Molano-Paz as appearing on a blacklist. The friend declined to provide the requested letter because he feared AUC retribution.

6

previously immigrated to the United States and who had become a United States citizen.[6]

During the interview at the consulate, Molano-Paz and Gutierrez-Garcia did not disclose

any of the events concerning the FARC or the AUC because, they said, they feared their

tourist visas would be withheld if they did so.

The visas were granted, and Molano-Paz and his family travelled to the United

States to stay with Gutierrez-Garcia's brother in New Jersey. Molano-Paz filed the first

of three applications for asylum on November 2, 2002. This was followed by the second

application on December 17, 2002. Molano-Paz testified that the two applications were

prepared by a woman named Dulce Cuco, who he mistakenly thought was an attorney.[7]

He claims never to have met the woman in person, stating that they spoke only by phone.

According to Molano-Paz, he was misled by this woman, who filled out the applications

incorrectly. In both of the applications, Molano-Paz states that he was threatened with

death by "subersivos," and that he has a politically active uncle who was detained for a

week and badly beaten by a group called "Al Margen." According to the applications, the

uncle's political activities put his entire extended family, including Molano-Paz, in

danger. There is no mention in either application of the FARC kidnapping or the AUC

---

[6] The brother-in-law submitted a Form I-130 ("Petition for Alien Relative") to the INS on behalf of his sister on October 9, 2001, prior to Molano-Paz and Gutierrez-Garcia's arrival in the United States. Molano-Paz claims that he knew nothing about the Form I-130 until after their arrival.

[7] Cuco declined to testify at Molano-Paz's hearing when he asked her to do so.

7

"condolence package."

Molano-Paz's third application for asylum, which he produced at the merits hearing before the IJ, was dated June 9, 2003. It contains sworn affidavits by Molano-Paz and Gutierrez-Garcia. It is the only one of the three applications to allege the kidnapping by the FARC or the receipt of telephone threats and a "condolence package" from the AUC.

On July 2, 2003, following a hearing at which Molano-Paz testified, the IJ denied Molano-Paz's application for asylum, withholding of removal, and relief under the CAT. The IJ found that Molano-Paz's testimony was not credible. He also concluded that even if Molano-Paz had been credible his application would be denied on the merits for failing to establish past persecution or a well-founded fear of future persecution on the basis of any statutorily protected status.

## II.

### Legal Standards

To qualify as a "refugee" who may receive asylum, an alien must establish that s/he is unable or unwilling to return to his or her country of nationality "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INS v. Elias-Zacarias, 502 U.S. 478, 481 (1992) (internal quotations and citations omitted). The persecution alleged must be at the hands of the government or individuals the government is either unable or

8

unwilling to control. Gao v. Ashcroft, 299 F.3d 266, 272 (3d Cir. 2002) (internal citation and quotations omitted).

To establish past persecution and entitlement to asylum, an applicant must show: (1) an incident (or incidents) that constituted persecution; (2) that occurred on account of one of the statutorily protected grounds; and (3) that was (or were) committed by the government or forces the government is either unable or unwilling to control. Berishaj v. Ashcroft, 378 F.3d 314, 323 (3d Cir. 2004). To establish a well-founded fear of persecution, an asylum applicant must show "that [he or] she has a genuine fear, and that a reasonable person in [his or] her circumstances would fear persecution if returned to [his or] her native country." Gao, 299 F.3d at 272. The BIA and this court have defined persecution to mean "extreme conduct," Voci v. Gonzales, 409 F.3d 607, 614 (3d Cir. 2005), including conduct so severe that it "constitute[s] a threat to life or freedom," Fatin v. INS, 12 F.3d 1233, 1240 (3d Cir. 1993). Thus, "persecution does not encompass all treatment that our society regards as unfair, unjust, or even unlawful or unconstitutional." Id. at 1240.

The threshold for establishing eligibility for withholding of removal is even higher than that for establishing entitlement to asylum and requires the petitioner to demonstrate a "clear probability" that, upon deportation to the country of origin, his or "her life or freedom would be threatened on account of one of the statutorily enumerated factors." Senathirajah v. INS, 157 F.3d 210, 215 (3d Cir. 1998). Given this higher

9

standard, an applicant who does not qualify for asylum necessarily does not qualify for withholding of removal.  Guo v. Ashcroft, 386 F.3d 556, 561 n.4 (3d Cir. 2004).

To qualify for relief under the CAT, an applicant for relief bears the burden of proving through objective evidence that "it is more likely than not" that s/he or she would be "tortured" in the country to which the applicant would be removed.  Wang v. Ashcroft, 368 F.3d 347, 349 (3d Cir. 2004) (quoting 8 C.F.R. § 1208.16(c)(2)).

Whether an applicant has demonstrated "past persecution or a well-founded fear of future persecution" on account of a statutorily enumerated factor is a factual determination, which this court reviews under the substantial evidence standard.  Shardar v. Ashcroft, 382 F.3d 318, 323 (3d Cir. 2004); Abdille, 242 F.3d at 483 (3d Cir. 2001).  Under this standard, the IJ's finding must be upheld unless "the evidence not only supports" a contrary conclusion, "but compels it."  Elias-Zacarias, 502 U.S. at 481 n.1; see also Chang v. INS, 119 F.3d 1055, 1060 (3d Cir. 1997).

### III.

### Discussion

The IJ in this case denied relief on the basis of an adverse credibility determination.  Because credibility determinations are factual in nature, they are reviewed under the substantial evidence standard and must be upheld unless "any reasonable adjudicator would be compelled to conclude to the contrary."  Fiadjoe v.

10

Att'y Gen., 411 F.3d 135, 153 (3d Cir. 2005).[8]

We see no evidence in the record before us that would compel us to conclude that Molano-Paz testified credibly, and we cannot agree with his assertion that the testimonial inconsistencies identified by the IJ were "slight" or "minor" in light of the record as a whole. Petitioner's Br. at 12.[9] On the contrary, the record is rife with factual inconsistencies and unlikely coincidences that substantially undermine Molano-Paz's credibility. The IJ was thorough in setting forth his reasons for doubting the truth of Molano-Paz's testimony, and a review of those reasons reveals the seriousness of the factual discrepancies in the case.

For example, the IJ observed that there were significant differences between Molano-Paz's first two asylum applications and the third one. The most alarming incidents alleged in the third application – the kidnapping by the FARC and the receipt

---

[8] At oral argument, petitioner argued that the applicable standard for credibility determinations has been changed by the REAL ID Act. The REAL ID Act does not apply to this case, however. The credibility provisions in the Act apply only to applications made on or after May 11, 2005. See 8 U.S.C. § 1158(b)(1). Even if the REAL ID Act's standard were applicable to Molano-Paz's application, it would be less helpful to him than the standard it superseded.

[9] Petitioner conceded at oral argument that the inconsistencies were major, but he still maintained that they do not go to the heart of his claim. The argument is unpersuasive, as petitioner cannot plausibly contest that the kidnapping, the threatening phone calls, and the condolence package are the core facts supporting his claim.

of phone threats and a "condolence package" from the AUC – do not appear in either of Molano-Paz's first two applications.  The IJ concluded reasonably that the explanation offered for these striking omissions – that Molano-Paz's English is poor and that he had been misled by the preparer of the first two applications – was implausible, given Molano-Paz's advanced education, his brother-in-law's fluency in English, and his brother-in-law's proffer of assistance.

In addition, there were discrepancies between the affidavit attached to Molano-Paz's third application and his testimony to the IJ concerning the dates of crucial events (e.g., the date of the kidnapping, the date of the onset of threatening phone calls, and the date of the receipt of the "condolence package").  See supra notes 1, 3, 4.  Not only did the IJ find that averments concerning these critical dates were inconsistent throughout the record, he found that the timing of some of Molano-Paz's actions, including the filing of the complaint with the authorities in Puerto Asis in January 2002, was somewhat suspicious in light of the fact that his brother-in-law had filed a Form I-130 on the family's behalf in October 2001.  Although Molano-Paz denied having had any knowledge of the Form I-130 prior to his arrival in the United States, the IJ found that the timing of his brother-in-law's application suggested that Molano-Paz and Gutierrez-Garcia may have had a prior intention to immigrate to the United States and, therefore, a motive to embellish or fabricate events that might entitle them to asylum.

Finally, there were numerous factual inconsistencies internal to Molano-Paz's

testimony at the hearing itself. One illustration is the following exchange between the IJ

and Molano-Paz concerning the date of the alleged kidnapping:

> Q: Let me try to make myself clear. Let me make the question clear. First you said the guerillas kidnapped you in September 1999. Then you changed and said it was September 2000. Your brother's letter said it was September 2001, do you know why your brother's letter says September 2001?
>
> A: It was the year before I came to the United States.
>
> Q: But, you said that the guerillas kidnapped you in September of 2000.
>
> A: September 2000, I'm confused with the date...I'm bad with the dates, this is 2003, right. I arrived February 27, 2002.

App. at 80.

Molano-Paz's testimony at the hearing was confused and self-contradictory when

it came to matters lying at the very heart of his claim. His first two asylum applications

lack any reference to events on which his third application wholly depends. And the

record is replete with inconsistencies concerning the dates on which those events are

alleged to have occurred. Taken as a whole, the record contains substantial evidence

supporting the IJ's determination that Molano-Paz was not credible in his account of

events. Because we are bound to uphold the IJ's adverse credibility determination unless

evidence in the record compels a contrary conclusion, which it does not in this case, we

will deny the judgment of the BIA.[10]

---

[10] After making his adverse credibility determination, the IJ decided that the events alleged by Molano-Paz, even if true, would

13

THOMPSON, District Judge, concurring.

I write separately to express my dissatisfaction with the Immigration Judge's relentless resistance to and adversarial scrutiny of Dr. Molano-Paz's claims for asylum and withholding of removal. The IJ determined that Molano-Paz lacked credibility based upon various "flaws" in his asylum applications. In making that determination, however, the IJ made a number of questionable assumptions about human behavior.

The IJ criticized Molano-Paz for omitting the kidnapping by the FARC guerillas and the death threats by blacklisting and "condolence package" from the AUC paramilitary organization from his first two asylum applications. In response, Molano-Paz explained that those applications had been completed by an application preparer whom he had hired in the mistaken belief that she was a lawyer. Although Molano-Paz claims he told the preparer about the kidnapping and the condolence package, the preparer failed to include those events in the applications. The IJ rejected Molano-Paz's explanation as implausible, citing his failure to produce the preparer as a witness at the removal hearing.

The IJ's assumption that the derelict preparer would be willing to take responsibility for her omissions seems unrealistic. That assumption must be viewed

_____

not establish past persecution or a well-founded fear of future persecution on the basis of any statutorily protected ground. Because the judgment rests on the credibility determination, we need not consider whether Molano-Paz would have met his burden if his testimony had been found credible.

14

against the backdrop of the documented frequency with which so-called immigration consultants defraud immigrants in comparable situations. See Anne E. Langford, What's in a Name?: Notarios in the United States and the Exploitation of a Vulnerable Latino Immigrant Population, 7 Harv. Latino L. Rev. 115 (2004); see also Barroso v. Gonzales, — F.3d —, No. 03-72552, 2005 WL 3079103, at *1 (9th Cir. Nov. 18, 2005) ("Although [the preparer] told [the applicant] that he was an attorney, he was not; instead he was a 'notarial,' or an immigration consultant. These people, also called 'notarios,' are notorious . . . for preying on the immigrant community."). Asylum applications prepared by these illicit preparers are frequently sloppy, inaccurate, and riddled with omissions. See Langford, supra, at 124-25. Once discovered, attempts by the unwitting applicant to correct the errors frequently compound the problem by producing "inconsistencies" that undermine the applicant's credibility in the eyes of the IJ, who is unlikely to appreciate the difficulties the applicant faces. This Court has acknowledged these difficulties before:

> It can not be overstated that [c]aution is required [in making credibility determinations] because of the numerous factors that might make it difficult for an alien to articulate his/her circumstances with the degree of consistency one might expect from someone who is neither burdened with the language difficulties, nor haunted by the traumatic memories, that may hamper communication between a government agent and a petitioner.

Dia v. Ashcroft, 353 F.3d 228, 278 (3d Cir. 2003) (McKee, J., concurring in part, dissenting in part); see also Butt v. Gonzalez, — F.3d —, No. 03-4360, 2005 WL 3116631, at *5 n.10 (3d Cir. Nov. 23, 2005).

15

There are other examples of the IJ's "adverse assumptions." The IJ's assumption that Molano-Paz would, if acting in good faith, have asked his English speaking brother-in-law to review his applications cannot be dispositive when considering the conduct of an immigrant who thought he had hired a professional to prepare his application. The discrepancies between Molano-Paz's statement to the asylum officer and his testimony before the IJ on the subject of his involvement with the Liberales Unido at Orito also should have minimal bearing on his credibility.

Molano-Paz's difficulties with consistent dates in explaining the kidnapping can hardly be proof of falsification when all other signposts clearly indicate the same time line. Molano-Paz was kidnapped on September 16, 2001; he returned home and was treated on September 19, 2001; he received threats throughout the fall, culminating in his receipt of the condolence package in January 2002, at which point he moved to the city of Armenia; he left for the United States in February 2002, to be followed in June 2002 by his wife and children. While Molano-Paz's testimony about these dates was at times inconsistent, the IJ acknowledged in his opinion that the inconsistencies were non-critical, characterizing them as "slight."

I wonder what, if anything, Molano-Paz could have done to satisfy the IJ's credibility requirements. While I recognize that the substantial evidence standard requires that this Court afford the IJ's credibility findings "substantial deference so long as the findings are supported by sufficient cogent reasons," Butt, 2005 WL 3116631, at

16

*3, I question whether the assumptions against which the IJ measured Molano-Paz's credibility constitute such reasons, and I question whether those assumptions should be endorsed by this Court.

Issues of credibility aside, the IJ also denied Molano-Paz's application on the grounds that he had failed to establish past persecution, a well-founded fear of future persecution, or a likelihood that he would be tortured if withholding of removal were denied.

The IJ harshly criticized Molano-Paz for failing to offer tangible proof of his blacklisting by the AUC and of the condolence package death threat. But when Molano-Paz produced tangible evidence of his kidnapping trauma (i.e., a medical report from his brother, a medical doctor in Colombia, written after the September 16 kidnapping), the IJ questioned why Molano-Paz "would find it necessary" to produce such a report. The IJ's finding that Molano-Paz did not meet his burden of proof hardly seems compelling in light of his view that tangible evidence is required when unlikely to be available, but suspicious when produced.

The IJ also found that Molano-Paz had no reason to fear further persecution after his final relocation within Colombia, to Armenia, despite having recognized the dangers faced by health brigade participants throughout that country. Notably, the IJ even quoted from an Immigration Services discussion of those dangers:

> Colombian groups that carry out humanitarian work are 'definitely threatened,' [and] conducting health brigades and other similar activities

17

puts them at 'great risk' from any of the armed groups. . . . If individuals were doing human rights work, health care provision, or even providing micro-enterprise business training, any of the armed groups would perceive them as a threat to their control of a given neighborhood, town or region, and therefore could target them.

United States Citizenship and Immigration Services RIC Country Report on Colombia, available at http://uscis.gov/graphics/services/asylum/ric/documentation/COL02003.htm (May 2, 2002).

Under the substantial evidence standard, the IJ's findings regarding "'persecution,' and 'well-founded fear of persecution' . . . must be upheld unless the evidence not only supports a contrary conclusion, but compels it." Abdille v. Ashcroft, 242 F.3d 477, 483-84 (3d Cir. 2001) (citing INS v. Elias-Zacarias, 502 U.S. 478, 481 & n.1 (1992), and Chang v. INS, 119 F.3d 1055, 1060 (3d Cir. 1997) ("On questions of fact, we will reverse the . . . determination that [an applicant] is not eligible for asylum . . . only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed.")). Because the evidence in the record does not compel a conclusion to the contrary, I concur in the judgment, the IJ's questionable assumptions notwithstanding.