

2005 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-23-2005

# Butt v. Atty Gen USA

Precedential or Non-Precedential: Precedential

Docket No. 03-4360

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2005

## Recommended Citation

"Butt v. Atty Gen USA" (2005). *2005 Decisions.* Paper 179.
http://digitalcommons.law.villanova.edu/thirdcircuit_2005/179

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2005 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 03-4360

_____

KHALID MAHMOOD BUTT, A29 760 955;
SIDRAD KHALID, A29 760 957;
ALI KHALID, A29 760 959;
AYISHA JABEEN, A29 760 956;
WAQAR KHALID, A29 760 958;
SADIA KHALID, A29 760 960,

Petitioners

v.

*ALBERTO GONZALES, ATTORNEY GENERAL
OF THE UNITED STATES,

Respondent

*Substituted pursuant to Rule 43c, F.R.A.P.

_____

On Petition for Review of an Order of
The Board of Immigration Appeals
(BIA Nos. A29-760-955, A29-760-956,
A29-760-957, A29-760-958

A29-760-959, A29-760-960)

Argued March 10, 2005

Before: ROTH and AMBRO, <u>Circuit Judges</u>
SHAPIRO ,** <u>District Judge</u>

(Opinion filed: November 23, 2005)

John J. Seehousen, Esquire (Argued)
1530 Chestnut Street, Suite 606
Philadelphia, PA 19102

      Counsel for Petitioners

Peter D. Keisler
   Assistant Attorney General
David V. Bernal
   Assistant Director
Andrew C. MacLachlan, Esquire (Argued)
Office of Immigration Litigation
United States Department of Justice
P.O. Box 878, Ben Franklin Station
Washington, DC   20044

      Counsel for Respondent

---

     ** Honorable Norma L. Shapiro, Senior District Judge
for the United States District Court for the Eastern District of
Pennsylvania, sitting by designation.

OPINION OF THE COURT

AMBRO, Circuit Judge

Khalid Mahmood Butt petitions for review of the decision of the Board of Immigration Appeals ("BIA") denying his claims for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT").[1] The Immigration Judge ("IJ") presiding over Butt's case denied these claims based on his determination that Butt was not credible, and that decision was affirmed without opinion by the BIA. Because the IJ's credibility determination is not supported by substantial evidence in the record, we grant the petition.

## I. Factual Background & Procedural History

Butt is a native and citizen of Pakistan. From 1969 to 1970, he worked full time in his father's dry cleaning business. Subsequently, he worked there only part-time so that he could also work for the Pakistan People's Party ("PPP"), a political party. His involvement in that organization increased over time,

---

[1] Although there are multiple petitioners in this case, our discussion references only Butt. The other petitioners are Butt's wife and children, whose claims for asylum are derivative of his.

3

and in 1971 he began working for the PPP full time. Butt testified before the IJ that he did not receive compensation from the PPP, but his family was sufficiently well off to allow him to continue to work only for the party. Butt was the General Secretary of his local PPP ward from 1980 to 1990. From 1984 to 1996, he was also a "Counselor," which appears to be an elected position within the PPP.

Butt testified that, as General Secretary, he collected dues for the PPP and held party meetings at his home. He stated that the PPP existed to help local people solve their problems and that it wanted "everyone [to] . . . have a right to speak." Butt attempted to assist people within his ward with issues such as obtaining water facilities and health care. He also helped people who had problems with the police.

In the 1980s, Pakistan was under military rule, and Butt testified that he was arrested twice during this time—in 1987—and charged with being a troublemaker. According to Butt, the police told him on both occasions that they did not like the PPP and that he should stop his activities on behalf of the party. Each time Butt was released after a couple hours.

Elections were held in Pakistan in 1989, after the governing general died, and the PPP gained power in the country. However, its government dissolved on August 6, 1990. Butt testified that he was again arrested on August 31, 1990 and detained until September 7, 1990. He stated that he was not

given food or water for two days and that he was beaten at least twice a day, sometimes with a leather strap.  Butt related his treatment while detained as follows: "They hung me upside down and beat me.  They stripped me and beat me . . . . And they beat me up so brutally that my leg and my back [were] so hurt and still my leg and my back do[] not function properly." Butt stated that he could not walk for some time after he was released.

Butt and his wife testified that Butt was treated by a doctor (Dr. Sasjad) from September 10, 1990 to October 15, 1990 for his injuries and that his treatment took place at home. At his hearing, Butt introduced a doctor's note regarding this time period that reads: "Certified that I have examined and treated Mr. Khalid Mahmood Butt . . . . He reported at my clinic with multiple bruises on both legs and back.  He remained under my treatment . . . 10-9-90 to 15-10-90."  When asked about this note, Butt testified that he did not remember going to the clinic, but because he was unconscious when he was brought home after his release from detention, he may have been taken to the clinic for treatment at that time without having been aware of it.

Butt testified that, after this incident, his friends, family, and the PPP advised him that his life was in danger and that he and his family should leave the country.  He stated that he and his family went into hiding at a friend's house until they left Pakistan for the United States in November 1990.  According to Butt, the PPP arranged for their visas and passports.

5

Butt also testified that he was being "framed" for "another [criminal] case" right before he left Pakistan. A criminal information naming Butt, among others, as a member of the PPP was introduced as documentary evidence at his hearing before the IJ. Butt stated that he had not seen the actual document before he left Pakistan but that he knew about it at that time. According to his testimony, some of the other people named in the document were arrested and eventually released.

Butt and his family arrived in the United States in November 1990 on non-immigrant visitor visas that authorized them to stay in this country until May 1, 1991. He applied for asylum on May 21, 1991, claiming that he feared persecution if returned to Pakistan on account of his work with the PPP. Butt's wife and children filed derivative asylum applications. The Immigration & Naturalization Service ("INS")[2] in 1999 issued the family Notices to Appear for staying in the United States beyond the period authorized by their visas,[3] and the Butt

---

[2]As a result of the Homeland Security Act of 2002, Pub. L. No. 107-296, 116 Stat. 2135 (2002), the INS has since ceased to exist as an agency within the Department of Justice, and its enforcement functions have been transferred to Bureau of Immigration and Customs Enforcement within the Department of Homeland Security.

[3]It is unclear from the record why the INS waited to issue these Notices to Appear until the Butt family had been in this country for almost eight years longer than the period authorized

family conceded removability. At this time, Butt renewed his application for asylum and withholding of removal.

Butt appeared at a hearing before the IJ on his asylum, withholding of removal, and CAT claims in July 2001, and the IJ issued a written decision denying those claims in October 2001. The discrepancies between the testimony of Butt and his wife and the documentary evidence that had been submitted caused the IJ to "conclude that the respondents have deliberately lied to the court." Specifically, the IJ identified the "crucial part" of the Butts' testimony as their statements regarding the events leading to Mr. Butt's "incarceration and mistreatment and his examination and care by a physician afterwards." He found that the Butts' testimony on these issues could not be reconciled with the letter from Mr. Butt's doctor.

The BIA affirmed the IJ's decision without opinion in October 2003. Butt's petition for review of that decision is now before us.[4]

_____

by their visas. During the intervening time period, the PPP regained power in Pakistan from 1993 to 1996. Butt and his wife testified that they nevertheless did not return to Pakistan during that time because they were told by family and friends that it was not safe for them to go back. Butt was also afraid that the criminal information against him was still open.

[4]Because Butt does not assert that the denial of CAT relief was in error, we deem that claim waived. *See Lie v. Ashcroft*,

## II. Jurisdiction & Standard of Review

Under 8 U.S.C. § 1252(a), we have jurisdiction to hear a petition for review from a final order of the BIA. When the BIA affirms an IJ without opinion, "we review the IJ's opinion and scrutinize its reasoning." *Smriko v. Ashcroft*, 387 F.3d 279, 282 (3d Cir. 2004) (internal quotation marks and citation omitted). In asylum cases, we must uphold the agency's factual findings if they are supported by substantial evidence. *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 296 (3d Cir. 2004). That is, the denial of asylum can be reversed "only if the evidence presented by [the Petitioner] was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *INS v. Elias-Zacarias*, 502 U.S. 478, 481 (1992); *see also Abdille v. Ashcroft*, 242 F.3d 477, 483–84 (3d Cir. 2001) ("[T]he [agency]'s finding must be upheld unless the evidence not only supports a contrary conclusion, but compels it."). Adverse credibility determinations, like other factual findings in immigration proceedings, are reviewed under the substantial evidence standard. *Mulanga v. Ashcroft*, 349 F.3d 123, 131 (3d Cir. 2003).

## III. Discussion

---

396 F.3d 530, 532 n.1 (3d Cir. 2005) (holding that petitioner waived any argument relating to the denial of her CAT claim by not presenting it in her brief).

The Attorney General and his delegates may grant asylum to any alien who qualifies as a refugee under the Immigration & Nationality Act ("INA"). 8 U.S.C. § 1158(b)(1). A refugee is an alien who is "unable or unwilling" to return to his or her country of origin "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1101(a)(42)(A). "Aliens have the burden of supporting their asylum claims through credible testimony." *Gao v. Ashcroft*, 299 F.3d 266, 272 (3d Cir. 2002). "Testimony, by itself, is sufficient to meet this burden, if 'credible.'" *Id.* (quoting 8 C.F.R. § 208.13(a)). To establish eligibility for asylum, an applicant must demonstrate past persecution by substantial evidence or a well-founded fear of persecution that is both subjectively and objectively reasonable. *Lukwago v. Ashcroft*, 329 F.3d 157, 177 (3d Cir. 2003).

Butt's principal argument before us is that the IJ's adverse credibility finding was not supported by the record.[5]

---

[5]In his brief, Butt also contended that the BIA erred in affirming the IJ's decision in his case without an opinion because the IJ's decision was erroneous. However, at oral argument, Butt's counsel abandoned this argument in light of our decision in *Dia v. Ashcroft*, 353 F.3d 228 (3d Cir. 2003) (*en banc*), in which we held that the issuance of an affirmance without opinion was proper even though we proceeded to determine that the case should be remanded for the IJ to explain

Specifically, he contends that the finding was based solely on the IJ's erroneous interpretation of the doctor's note regarding his treatment and that, if the note is interpreted correctly, the finding cannot be upheld.[6] Butt further argues that, if the IJ's credibility determination is overturned, the record compels the conclusion that he is eligible for asylum.

A.   *The IJ's Interpretation of the Doctor's Note*

----

further the reasoning underlying her adverse credibility determination. *Id.* at 245, 251.

[6]The Government urges us to ignore this argument, contending that Butt failed to exhaust it by not raising it before the BIA and that our Court therefore does not have jurisdiction to consider it. According to the Government, "in his opening brief to this Court[,] Mr. Butt suggests for the first time that there is no contradiction between the testimony and the doctor's memo." Gov't Br. at 18. As the Government itself acknowledges, however, Butt's argument to the BIA was that the IJ's adverse credibility finding suffered from an "overreliance on a detail . . . principally relating to where some of the medical services were rendered." Gov't Br. at 14 (internal quotation marks and citation omitted). We believe that the Government's contention that this argument was not sufficient to preserve the argument Butt raises before us is, at best, a hyper-technical reading of his brief to the BIA, and thus we reject it.

We must afford the IJ's adverse credibility finding "substantial deference so long as the findings are supported by sufficient cogent reasons." *Reynoso-Lopez v. Ashcroft*, 369 F.3d 275, 278 (3d Cir. 2004) (internal quotation marks and citation omitted); *Senathirajah v. INS*, 157 F.3d 210, 216 (3d Cir. 1998) ("An immigration judge who rejects a witness's positive testimony because in his or her judgment it lacks credibility should offer a specific, cogent reason for his or her disbelief.") (internal quotation marks, brackets, and citation omitted). In this case, the determination that Butt was not credible was based on what the IJ perceived as a contradiction between Butt's testimony and the doctor's note that he submitted as corroborating evidence. The IJ stated:

> If the oral testimony is accurate and [Butt,] after being mistreated seriously, received medical attention at home only, why, the court must ask itself, does the doctor's letter explain[] that treatment was given to [Butt] for a period of 35 days at the doctor's clinic. Not only does the doctor's record state the period, by specifically pointing out the days of his admission and discharge, but it also provides a feeling of seriousness with respect to both the

11

condition [Butt] was [in] before admission and the type of diagnosis and treatment given . . . . Plain language interpretation . . . conveys a message that [Butt] was examined and treated by the writer, at the clinic for 35 days . . . . Assuming a reasonable explanation had been given, and assuming the court would believe the seriousness of these injuries, I could probably understand his forgetting that he was treated at the clinic rather than at home . . . . But how does one explain that his wife also forgot such an important fact and distinction?

The IJ's decision thus makes clear that he read the doctor's note to mean that Butt had been treated at the clinic itself for thirty-five days. However, we believe that the plain language of the note does not support that conclusion. As stated earlier, the note states that Butt "reported at my [the doctor's] clinic with multiple bruises on both legs and back. He remained under my treatment . . . 10-9-90 to 15-10-90."

A commonsense interpretation of this statement is that Butt (1) went to the doctor's clinic for treatment of his injuries

12

and (2) then received further treatment from the same doctor for a period of thirty-five days. Just because Butt "remained under [his doctor's] treatment" after reporting at the clinic does not, in everyday usage, mean that he remained under his doctor's treatment *at the clinic*. People often say that they have remained under a particular doctor's care for a certain period of time. If these types of statements actually had the meaning the IJ attributed to the doctor's similar statement here, a pediatrician who commented that a newborn had been brought for treatment at his or her office and remained under his or her care until age eighteen would be stating that the child continuously received care at the pediatrician's office for *eighteen years*. This interpretation of the pediatrician's comment is nonsensical and is certainly not how the statement would be understood if made during the course of a normal conversation.

Our example is extreme, but it illustrates our critical concern with the IJ's interpretation of the note. Although the IJ characterized his reading of the note as based on its "plain language," he did not consider the everyday usage of the phrase "remained under his doctor's care." Instead, the IJ read into the note an additional statement that Butt remained under the doctor's care "at the clinic." The IJ stated that, if the doctor's note could not be reconciled with the "crucial part" of Butt's and his wife's testimony regarding his treatment, Butt's case would "collapse[] as a pyramid of cards." Not only does this simile stretch to excess, it risks a "turnaround is fair play" response. *See Dia v. Ashcroft*, 353 F.3d 228, 251 (3d Cir. 2003)

13

(*en banc*) (stating that an IJ's "reasoning process appear[ed] to break down as the IJ, repeatedly, [drew] an unreasonable conclusion from a fact susceptible to differing interpretations" and that such an "aggregation of empty rationales . . . devolve[d] into an unsupported finding of adverse credibility").

The IJ saw the contradiction he perceived between the text of the note and Butt's testimony as evidence that Butt had made "a deliberate effort . . . to mislead th[e] Court." This conclusion cannot stand once we use the straightforward meaning of the note—that Butt was treated for bruises on his legs and back at the clinic and then generally remained under the care of the same doctor for over a month (not necessarily at the clinic). That reading is consistent with Butt's testimony that: (1) he was beaten so "that [his] leg and [his] back [were] . . . hurt and . . . [did] not function properly"; (2) he was under the care of Dr. Sajsad, the author of the note, from September 10, 1990 to October 15, 1990; and (3) his treatment took place at home, but that "there could be one possibility that I was almost unconscious when they brought be home. Probably they took me to his clinic and then he treated me." (Butt did not remember the details "because [his] situation was extremely worse at that time."[7]) Accordingly, contrary to the IJ's conclusion, the note

_____

[7]The IJ characterized Butt's explanation that he may have been taken to the clinic while unconscious as not being "reasonable." As quoted earlier, the IJ went on to state that,

14

*can* be reconciled with Butt's testimony.  And, as there is no

> [a]ssuming a reasonable explanation had been given, and assuming the court would believe the seriousness of these injuries, I could probably understand his forgetting that he was treated at the clinic rather than at home.  His poor physical condition . . . could under those circumstances account for the discrepancy.  But how does one explain that his wife also forgot such an important fact and distinction?

In asking this question, the IJ ignores that, in her testimony, Butt's wife gave an explanation as to why she did not remember that her husband had been treated at the clinic, stating that, *inter alia*, she "did not know" whether Butt "went there [to the doctor's office] or not but [she thought] all treatment was given at home . . . ."  Thus, Butt's wife did not unequivocally testify that her husband was only treated at home.  It may be that the IJ did not credit Butt's wife's explanation, but he did not give any indication in his decision as to whether that was the case.  In addition, the distinction between the testimony of both Butt and his wife that they could not remember whether he had been taken to the clinic, and the doctor's statement that Butt reported to the clinic, becomes much less dramatic when the doctor's note is understood to refer to only one clinic visit rather than to an entire month of care at the clinic.

15

contradiction between that testimony and the plain language of the note, there is correspondingly no support for the IJ's conclusion that Butt lied to the Immigration Court.

The IJ also determined that "[t]he doctor's letter or note [was] crucial to the reliability [he could] attribute to [Butt]'s other documents" and that, apparently because of the purported contradiction between the note and the testimony, "[t]he cloud that hangs over [Butt]'s evidence has not been dissipated." Again, when the commonsense reading of the doctor's note is used, it is consistent with Butt's testimony and therefore cannot be viewed as casting (or contributing to) a "cloud" over the other evidence submitted by him in support of his asylum application.[8] Thus, the alleged contradiction between the note

_____

[8]The IJ's conclusion that the doctor's note did not dissipate the cloud he believed hung over Butt's other evidence would be untenable even if we agreed with the IJ's determination that there was a contradiction between the note and Butt's testimony. That conclusion rested on the IJ's crediting of what he believed the doctor had written—that Butt had reported to the clinic and stayed there for thirty-five days—and not crediting Butt's testimony that he was treated (at least principally) at home for that period. The IJ's decision repeatedly stated that Butt was lying and deliberately misleading the Court. If the IJ viewed the testimony as unreliable and the note as reliable, how then could he conclude that the note itself contributed to the "cloud" hanging over the evidence? Thus, we believe that the IJ's statement that it did is illogical when viewed in conjunction with

16

and the testimony, based as it is on the strained inferences of the IJ rather than on commonly understood usage, does not provide a sound basis for his adverse credibility determination. *See Dia,* 353 F.3d at 251 (holding that adverse credibility determination was not supported by substantial evidence when, *inter alia*, "the conclusions of the IJ [were] more puzzling than plausible, more curious than commonsense").

B.    *Other Reasons for the Adverse Credibility Determination*

Once the IJ's conclusions regarding the relationship between the doctor's note and Butt's testimony are unraveled, we are left with only two other reasons advanced by the IJ in support of the adverse credibility determination: (1) his generic critique of the proffered testimony, which he described as "thin" and "extremely vague"; and (2) his view of the other documents submitted by Butt as "equally flimsy in that neither is verified or authenticated." As stated earlier, we afford an IJ's adverse credibility determination substantial deference if it is supported by "specific, cogent reasons." *Reynoso-Lopez*, 369 F.3d at 278 (internal quotations marks and citation omitted). These statements, which were secondary to the IJ's determination that the note and testimony conflicted as a basis for the adverse

the rest of his decision and, as such, does not fall into the category of a "specific cogent" reason as required by, *inter alia*, *Reynoso-Lopez* to support the adverse credibility determination.

17

credibility determination, are simply too general and conclusory to provide a basis for us to uphold his determination. They do not give any insight into why the IJ thought the testimony was vague or why there was reason to question the authenticity of the documents Butt submitted. Without such an explanation, we are unable to ascertain whether the IJ's adverse credibility determination was supported by substantial evidence.[9] *See, e.g., Dia*, 353 F.3d at 252 (stating that "[a]bsent a reason such as implausibility or inconsistency based in the record . . .[,] the IJ should not have summarily dismissed [the petitioner]'s

_____

[9]We note that this is particularly true in this case, where the record contains testimony that is fairly well developed as well as documents that appear to support that testimony (including evidence of Butt's membership in the PPP, the criminal information that Butt claimed prompted him to flee Pakistan, and the doctor's note stating the places in which Butt was injured and the length of his treatment). We recognize that the fact-finder is generally in the best position to judge credibility and may have insights that cannot be gleaned from the cold record. If this is the case, however, we do not think it unreasonable to require the IJ to provide specific, cogent explanations of why apparently sound testimony was rejected. As we stated in *Dia*, "requir[ing] sound reasoning [from the IJ] breathes life into [the substantial evidence] standard." 353 F.3d at 251. We cannot say that this requirement is satisfied when there is no explanation given for the IJ's disbelief of Butt's testimony other than his erroneous interpretation of the doctor's note and his statement that the testimony did not "impress" him.

18

testimony on [a particular] point"); *Mulanga*, 349 F.3d at 137–38 (holding that an IJ's disbelief of an alien's testimony was "unsound" when the only foundation the IJ articulated for that belief was that the testimony lacked "common sense").

In this context, we are compelled to conclude that the IJ's adverse credibility determination was erroneous. We also note that, once the doctor's note is given its plain language meaning, it is, as stated above, reconcilable with Butt's testimony, removing the only inconsistency the IJ pointed to in his decision. The IJ himself stated that, without the contradiction he perceived, "[t]he testimony presented was thin . . . but it would have survived a certain degree of consistency . . . ." If consistency is crucial to credibility, as we think it is, we do not see how the record in this case can support an adverse credibility determination. However, in keeping with Supreme Court and our precedent, we give the IJ an opportunity to revisit the credibility issue on remand (without regard to his prior adverse credibility determination).[10] *See INS v. Ventura,* 537 U.S. 12, 16

---

[10] The Government notes other inconsistencies in the record—such as the precise date Butt may have been taken to the clinic—that it believes support the IJ's adverse credibility determination. *See* Gov't Br. at 15–16 nn. 5–7. However, the IJ did not rely on any of these other alleged inconsistencies in making his adverse credibility determination. Moreover, we emphasize here, as we have previously, that "[g]enerally, minor inconsistencies and minor admissions that reveal nothing about

19

(2002) (*per* curiam) (appellate courts should, upon reversing a decision of the BIA, remand the case to the agency for further proceedings except in rare circumstances); *Dia*, 353 F.3d at 260 ("concluding . . . that because of the lack of substantial evidence to support the adverse credibility determination, we will remand in order for the agency to further explain or supplement the record"); *Ezeagwuna v. Ashcroft*, 325 F.3d 396, 411 (3d Cir. 2003) (reversing BIA's adverse credibility determination and stating that, in keeping with *Ventura*, "[w]e [would] not assess [the petitioner]'s entitlement to relief based on the record as we have required it to be modified by this opinion because the agency should have the opportunity to do so").

--------

an asylum applicant's fear for his safety are not an adequate basis for an adverse credibility finding." *Gao*, 299 F.3d at 272 (internal quotation marks and citation omitted); *see also Dia*, 353 F.3d at 278 (McKee, J., concurring in part, dissenting in part) ("It can not be overstated that '[c]aution is required [in making credibility determinations] because of the numerous factors that might make it difficult for an alien to articulate his/her circumstances with the degree of consistency one might expect from someone who is neither burdened with the language difficulties, nor haunted by the traumatic memories, that may hamper communication' between a government agent and a petitioner." (quoting *Zubeda v. Ashcroft*, 333 F.3d 463, 476 (3d Cir. 2003))).

## V. Conclusion

Although we must afford substantial deference to an adverse credibility finding, we are forced to conclude that even under that standard the IJ's credibility determination here does not pass muster. The contradiction the IJ saw between the doctor's note and Butt's testimony was created by the IJ's own strained interpretation of the note. In the law, as in all things, common sense must be our guide. Yet the IJ failed even to consider the everyday usage of the term "under a doctor's care" in concluding that Butt lied about where he received treatment for his injuries. This flaw colored the whole of the IJ's analysis, which was grounded in his incorrect interpretation of the note, and the only arguably independent reasons the IJ gave for finding Butt incredible were too general for us to ascertain whether they were supported by substantial evidence.

For these reasons, the BIA erred in affirming the IJ's decision. Although Butt asks us also to rule in his favor on the merits of his asylum claim, we decline his invitation in order to allow the agency the opportunity to review the substance of that claim. We therefore remand this case to the BIA with instructions to remand it to the IJ for reconsideration of his decision and a ruling on Butt's asylum and withholding of removal claims without reference to the prior adverse credibility

finding.[11]

---

[11]In connection with Butt's asylum claim, we note that Butt's longstanding membership in the PPP—a minority party for most of the time he was affiliated with it, in conjunction with his arrests and beating that resulted in severe injuries (the general nature of which were corroborated by the doctor's note)—seem on their surface to make out a textbook case of persecution on account of political opinion.