THOMPSON, District Judge,
concurring.
I write separately to express my dissatisfaction with the Immigration Judge’s relentless resistance to and adversarial scrutiny of Dr. Molano-Paz’s claims for asylum and withholding of removal. The IJ determined that Molano-Paz lacked credibility based upon various “flaws” in his asylum applications. In making that determination, however, the IJ made a number of questionable assumptions about human behavior.
The IJ criticized Molano-Paz for omitting the kidnapping by the FARC guerillas and the death threats by blacklisting and “condolence package” from the AUC paramilitary organization from his first two asylum applications. In response, Molano-Paz explained that those applications had been completed by an application preparer whom he had hired in the mistaken belief that she was a lawyer. Although Molano-Paz claims he told the preparer about the kidnapping and the condolence package, the preparer failed to include those events in the applications. The IJ rejected Molano-Paz’s explanation as implausible, citing his failure to produce the preparer as a witness at the removal hearing.
The IJ’s assumption that the derelict preparer would be willing to take responsibility for her omissions seems unrealistic. That assumption must be viewed against *432 the backdrop of the documented frequency with which so-called immigration consultants defraud immigrants in comparable situations. See Anne E. Langford, What’s in a Name?: Notarios in the United States and the Exploitation of a Vulnerable Latino Immigrant Population, 7 Harv. Latino L.Rev. 115 (2004); see also Barroso v. Gonzales, 429 F.3d 1195, 1196 (9th Cir.2005) (“Although [the preparer] told [the applicant] that he was an attorney, he was not; instead he was a ‘notarial,’ or an immigration consultant. These people, also called ‘notarios,’ are notorious ... for preying on the immigrant community.”). Asylum applications prepared by these illicit preparers are frequently sloppy, inaccurate, and riddled with omissions. See Langford, supra, at 124-25. Once discovered, attempts by the unwitting applicant to correct the errors frequently compound the problem by producing “inconsistencies” that undermine the applicant’s credibility in the eyes of the IJ, who is unlikely to appreciate the difficulties the applicant faces. This Court has acknowledged these difficulties before:
It can not be overstated that [c]aution is required [in making credibility determinations] because of the numerous factors that might make it difficult for an alien to articulate his/her circumstances with the degree of consistency one might expect from someone who is neither burdened with the language difficulties, nor haunted by the traumatic memories, that may hamper communication between a government agent and a petitioner.
Dia v. Ashcroft, 353 F.3d 228, 278 (3d Cir.2003) (McKee, J., concurring in part, dissenting in part); see also Butt v. Gonzales, 429 F.3d 430, 438 n. 10 (3d Cir.2005).
There are other examples of the IJ’s “adverse assumptions.” The IJ’s assumption that Molano-Paz would, if acting in good faith, have asked his English speaking brother-in-law to review his applications cannot be dispositive when considering the conduct of an immigrant who thought he had hired a professional to prepare his application. The discrepancies between Molano-Paz’s statement to the asylum officer and his testimony before the IJ on the subject of his involvement with the Liberales Unido at Orito also should have minimal bearing on his credibility.
Molano-Paz’s difficulties with consistent dates in explaining the kidnapping can hardly be proof of falsification when all other signposts clearly indicate the same time line. Molano-Paz was kidnapped on September 16, 2001; he returned home and was treated on September 19, 2001; he received threats throughout the fall, culminating in his receipt of the condolence package in January 2002, at which point he moved to the city of Armenia; he left for the United States in February 2002, to be followed in June 2002 by his wife and children. While Molano-Paz’s testimony about these dates was at times inconsistent, the IJ acknowledged in his opinion that the inconsistencies were noncritical, characterizing them as “slight.”
I wonder what, if anything, Molano-Paz could have done to satisfy the IJ’s credibility requirements. While I recognize that the substantial evidence standard requires that this Court afford the IJ’s credibility findings “substantial deference so long as the findings are supported by sufficient cogent reasons,” Butt, 429 F.3d at 434, I question whether the assumptions against which the IJ measured Molano-Paz’s credibility constitute such reasons, and I question whether those assumptions should be endorsed by this Court.
Issues of credibility aside, the IJ also denied Molano-Paz’s application on the grounds that he had failed to establish *433 past persecution, a well-founded fear of future persecution, or a likelihood that he would be tortured if withholding of removal were denied.
The IJ harshly criticized Molano-Paz for failing to offer tangible proof of his blacklisting by the AUC and of the condolence package death threat. But when Molano-Paz produced tangible evidence of his kidnapping trauma (i.e., a medical report from his brother, a medical doctor in Colombia, written after the September 16 kidnapping), the IJ questioned why Molano-Paz “would find it necessary” to produce such a report. The IJ’s finding that Molano-Paz did not meet his burden of proof hardly seems compelling in light of his view that tangible evidence is required when unlikely to be available, but suspicious when produced.
The IJ also found that Molano-Paz had no reason to fear further persecution after his final relocation within Colombia, to Armenia, despite having recognized the dangers faced by health brigade participants throughout that country. Notably, the IJ even quoted from an Immigration Services discussion of those dangers:
Colombian groups that carry out humanitarian work are ‘definitely threatened,’ [and] conducting health brigades and other similar activities puts them at ‘great risk’ from any of the armed groups---- If individuals were doing human rights work, health care provision, or even providing micro-enterprise business training, any of the armed groups would perceive them as a threat to their control of a given neighborhood, town or region, and therefore could target them.
United States Citizenship and Immigration Services RIC Country Report on Colombia, available at http://uscis.gov/ graphics/services /asylum/ric/ documentation/ COL02003.htm (May 2, 2002).
Under the substantial evidence standard, the IJ’s findings regarding “ ‘persecution,’ and ‘well-founded fear of persecution’ ... must be upheld unless the evidence not only supports a contrary conclusion, but compels it.” Abdille v. Ashcroft, 242 F.3d 477, 483-84 (3d Cir.2001) (citing INS v. Elias-Zacarias, 502 U.S. 478, 481 & n. 1, 112 S.Ct. 812, 117 L.Ed.2d 38 (1992), and Chang v. INS, 119 F.3d 1055, 1060 (3d Cir.1997) (“On questions of fact, we will reverse the ... determination that [an applicant] is not eligible for asylum ... only if a reasonable fact-finder would have to conclude that the requisite fear of persecution existed.”)). Because the evidence in the record does not compel a conclusion to the contrary, I concur in the judgment, the IJ’s questionable assumptions notwithstanding.