

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-2-2007

# Kyrnuchuk v. Atty Gen USA

Precedential or Non-Precedential: Non-Precedential

Docket No. 06-3081

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Kyrnuchuk v. Atty Gen USA" (2007). *2007 Decisions.* Paper 629.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/629

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 06-3081
_____

ROMAN KYRNUCHUK,

Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES,

Respondent.

_____

Petition for Review of an Order of the
United States Department of Justice
Board of Immigration Appeals
BIA No. A96-207-232
Immigration Judge:  Henry S. Dogin

_____

Submitted Under Third Circuit LAR 34.1(a)
on July 9, 2007

Before: RENDELL and AMBRO, Circuit Judges,
and SHAPIRO,* District Judge.

(Filed: August 2, 2007)
_____

OPINION OF THE COURT
_____

_____

* Honorable Norma L. Shapiro, Senior Judge of the United States District Court for
the Eastern District of Pennsylvania, sitting by designation.

RENDELL, Circuit Judge.

Roman Kyrnuchuk[1] petitions for review of the May 22, 2006 Order of the Bureau

of Immigration Appeals ("BIA") affirming the previous denial by the Immigration Judge

("IJ") of Kyrnuchuk's applications for asylum, withholding of removal, and protection

under the Convention Against Torture ("CAT"). Because the BIA's opinion affirmed

some aspects of the IJ's decision while adopting, though not thoroughly discussing,

others, "we must look to both decisions to satisfy our obligation . . . to review the

administrative decision meaningfully." *Chen v. Ashcroft*, 376 F.3d 215, 222 (3d Cir.

2004). As explained below, we lack jurisdiction over Kyrnuchuk's asylum claim.

However, we have jurisdiction over Kyrnuchuk's claims for withholding and CAT

protection, pursuant to 8 U.S.C. § 1252. We will deny the petition for review.

## I.

Kyrnuchuk is a native and citizen of Ukraine who entered the United States in the

Fall of 2002.[2] On February 20, 2004, agents from the Department of Homeland Security

---

[1] We note that three different spellings of Petitioner's name appear within the record: "Kyrnuchuk," "Kyrnichuk," and "Kyrnychuk." We use "Kyrnuchuk" in our opinion and judgment, as it is the spelling associated with Petitioner's alien registration number and is Petitioner's name as it appears in the Agency decisions on review.

[2] While testifying before the IJ on December 1, 2004, Kyrnuchuk claimed that he entered the United States via car from Mexico. However, at his February 23, 2005 hearing, Kyrnuchuk testified that he entered the United States on a flight that arrived in New York. Given these ambiguities, as well as other questions about his passport and visa, the IJ ultimately could not determine when, where or how Kyrnuchuk entered the country. Nevertheless, Kyrnuchuk conceded before the IJ, and does not contest, that he was and is present in the United States unlawfully.

("DHS") served Kyrnuchuk with a Notice to Appear, charging him as an alien present in the United States who had not been admitted or paroled and is subject to removal pursuant to Immigration and Nationality Act ("INA") § 212(a)(6)(A)(i). On February 23, 2005, after a series of false-starts, the IJ held removal proceedings. Kyrnuchuk conceded that he was removable as charged, but sought asylum, withholding of removal and protection under CAT.

In support of his claims, Kyrnuchuk testified that, though he lived permanently in Ukraine, he worked seasonally in Poland, at two and a half month intervals, for a company that produced finished granite for use in the creation of monuments, fireplaces and other large stone objects. Kyrnuchuk primarily worked as a polisher but also helped to market the company's products in Ukraine when he returned home. According to Kyrnuchuk, he made nearly $600 per month and, therefore, would often return to Ukraine with over $1000 in cash. Kyrnuchuk's salary enabled him to buy a car and begin building a home. As Kyrnuchuk put it, he was "making a lot more money than most people in Ukraine, even people who had their own businesses." Appx. at 191. Kyrnuchuk argued that his success placed him "within [a] social class of . . . visibly wealthy Ukrainians" and described a series of incidents in which he was targeted by organized crime and corrupt local police for this reason. Appx. at 161.

First, in December 2000, Kyrnuchuk said that, as he was pulling his car away from the front of his apartment building, two men approached him in an unmarked vehicle.

3

One was dressed in a police uniform and asked Kyrnuchuk to exit the vehicle and produce his license and registration. Before he could do so, the second man, who was in plain clothes, punched and kicked Kyrnuchuk. While Kyrnuchuk was lying on the ground, the men stole his vehicle. Kyrnuchuk was able to get up, walk home and did not require medical attention. Soon thereafter, Kyrnuchuk claims that he received a telephone call demanding money in exchange for the return of his car. Kyrnuchuk immediately went to the local police and met with an officer named Boiko, who simply advised Kyrnuchuk to comply with the thieves' demands.

Apparently not happy about receiving this advice from a police officer, Kyrnuchuk went to the local prosecutor and left a written statement about Officer Boiko's misconduct. Kyrnuchuk later received a telephone call from the police precinct suggesting that he come back to the police station. Officer Boiko took Kyrnuchuk into his office, handed him money, directed him to count it, and then, when Kyrnuchuk handed the money back, told him that he could be arrested for attempted bribery. Boiko locked up Kyrnuchuk for three to four hours, and then released him. That evening Kyrnuchuk received a telephone call from the people who had taken his car and, sobered by his experience with Boiko, met the individuals and paid them $2,000. The individuals, all in plain clothes, told Kyrnuchuk that they added $500 to the "contribution" to give to Officer Boiko and warned Kyrnuchuk to never again complain about the police.

4

Then, beginning in the Spring 2001, Kyrnuchuk testified that he received phone calls on two occasions, both following trips to Poland, from the same group who had demanded money for the return of his car. On both occasions, the individuals insisted that Kyrnuchuk give them $500 and threatened to kill members of his family. Kyrnuchuk complied.

In February 2002, and again after returning from Poland, Kyrnuchuk testified that he was walking home late one evening when three men, whom he could not recognize, beat him and demanded money. The men said that they would direct the local tax inspector to investigate Kyrnuchuk, and that they had friends who would make sure he would be arrested if he did not pay. Kyrnuchuk alleged that, as a result of the beating, he had "injuries on [his] body" and, specifically, a broken nose. Appx. at 138. Kyrnuchuk submitted an affidavit from a doctor, which indicated that Kyrnuchuk had sustained head injuries, including a concussion, and a broken nose.

After the February 2002 incident, Kyrnuchuk testified that he did not again return to Poland. However, the IJ questioned whether this was accurate. Particularly, the IJ asked Kyrnuchuk about the discrepancy between the doctor's affidavit, which stated that Kyrnuchuk received medical treatment on February 2, 2002 in Ukraine, and his passport, which showed that Kyrnuchuk had traveled to Poland on February 24, 2002, that is, *after* Kyrnuchuk was allegedly beaten. Kyrnuchuk responded by explaining that the doctor who had filled out the medical form must have inserted the incorrect date.

5

Finally, Kyrnuchuk alleged that, in Fall 2002, the same group of criminals summoned him to a bus stop and demand that he ferry a package to Poland. It was this request, Kyrnuchuk alleges, that finally compelled him to leave for the United States.

The IJ denied Kyrnuchuk's applications for asylum, withholding of removal and protection under CAT and ordered him removed to Ukraine. With respect to Kyrnuchuk's asylum claim, the IJ denied Kyrnuchuk's application after finding that he did not file within one year of entering the United States, a fact that Kyrnuchuk's counsel acknowledged could not be overcome. With respect to withholding of removal, the IJ rejected Kyrnuchuk's argument that his status as a "visibly wealthy Ukrainian" placed him within a "particular social group" and, therefore, found him ineligible for withholding as a matter of law. *See* INA § 241(b)(3) (stating that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, *membership in a particular social group*, or political opinion"). Finally, the IJ found significant the inconsistencies between the doctor's affidavit, the date on which Kyrnuchuk alleged he was beaten (February 2, 2002), and the passport stamp reflecting Kyrnuchuk's February 24, 2002 travel to Poland. In the IJ's view, these inconsistencies called into question the authenticity of the doctor's affidavit and, therefore, the veracity of Kyrnuchuk's claim that he had been beaten. Appx. at 66 ("But I believe he is not telling me the truth and I think deliberately lying concerning the act of persecution which is the

6

only act of persecution of violence in which he allegedly was harmed."). For this reason, the IJ held that Kyrnuchuk had not shown persecution, let alone torture, and denied his CAT claim.

On appeal, the BIA affirmed, holding that the IJ was correct in determining that Kyrnuchuk's economic status did not qualify as a "particular social group" and that Kyrnuchuk had failed to show a likelihood of being tortured if returned to Ukraine.

Kyrnuchuk timely appealed the BIA's decision to us.

## II.

Kyrnuchuk's primary argument on appeal is that the BIA erred in affirming the IJ's determination that "visibly wealthy Ukranians" do not qualify as a "particular social group" for purposes of asylum and withholding. However, Kyrnuchuk fails to mention that the IJ denied his asylum claim after determining that it was not timely filed. As is clear, we are without jurisdiction to review this determination. *See* 8 U.S.C. § 1158(a)(3); *Tarrawally v. Ashcroft*, 338 F.3d 180, 185 (3d Cir. 2003) ("We agree that the language of 8 U.S.C. § 1158(a)(3) clearly deprives us of jurisdiction to review an [IJ's] determination that an asylum petition was not filed within the one year limitation period, and that such period was not tolled by extraordinary circumstances."). Therefore, only Kyrnuchuk's withholding and CAT claims are before us.

With respect to Kyrnuchuk's withholding claim, the BIA agreed with the IJ that "Ukranians who have been identified as relatively well to do and who might be targeted

7

for extortion by racketeers and corrupt officials is too broad a category of individuals to qualify as a 'particular social group' for purposes of determining whether the respondent is likely to face persecution upon his return to Ukraine." Appx. at 25. Kyrnuchuk disagrees. Because this dispute implicates a question of law, our review is *de novo*. However, "'the BIA should be accorded *Chevron* deference as it gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication.'" *Valansi v. Ashcroft*, 278 F.3d 203, 208 (3d Cir. 2002) (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999)). The statute at issue here, INA § 241(b)(3), contains an ambiguous term, namely, "particular social group." *See Lukwago v. Ashcroft*, 329 F.3d 157 (3d Cir. 2003) ("The contours of what constitutes a 'particular social group' are difficult to discern. We have noted that the statutory language is not very instructive and that, in its broadest literal sense, the phrase is almost completely open-ended.") (citations and internal quotations omitted). Therefore, the BIA's interpretation is entitled to deference so long as it is reasonable. *See Aguirre-Aguirre*, 526 U.S. 415, 424-25 (1999).

In *Fatin v. INS*, 12 F.3d 1233 (3d Cir. 1993), we adopted the definition of "particular social group" originally set forth by the BIA in *Matter of Acosta*, 19 I. & N. Dec. 211 (1985), and determined that "[t]he shared characteristic [binding the 'social group'] might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. . . . However, whatever the common characteristic that defines the group,

8

it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences." *Fatin*, 12 F.3d at 1239-40. Here, the characteristic identified by Kyrnuchuk's alleged persecutors was his possession of money and his possession of a vehicle. Though we would not say that anyone should be "required" to divest themselves of their own hard-earned money or possessions, we nevertheless cannot say that these characteristics are "fundamental" to aliens' "individual identities or consciences." Indeed, were we to so hold, we would essentially elevate any victim of theft or extortion to "membership within a particular social group." Clearly Congress did not intend such a result. More importantly, the BIA has chosen not to adopt such an interpretation and we cannot say that it was unreasonable in doing so. Therefore, the BIA did not err in finding that Kyrnuchuk's relative wealth did not place him within a "particular social group."

With respect to his CAT claim, the IJ denied relief after finding that the inconsistencies in Kyrnuchuk's story about the February 2002 beating severely undermined his credibility and, therefore, the likelihood that Kyrnuchuk had actually suffered severe abuse in the past. *See* Appx. at 69 ("[I]f he is going to lie to me about the beating, I think there is a serious credibility issue as how dangerous and how serious his problems are.") "We must afford the IJ's adverse credibility finding 'substantial deference so long as the findings are supported by sufficient cogent reasons.'" *Butt v. Gonzales*, 429 F.3d 430, 434 (3d Cir. 2005) (quoting *Reynoso-Lopez v. Ashcroft*, 369 F.3d

9

275, 278 (3d Cir. 2004)). Here, the IJ's findings are supported by cogent reasons, as he clearly pointed to a significant inconsistency in Kyrnuchuk' story. Therefore, there is little to no evidence that Kyrnuchuk is "more likely than not" to be tortured upon removal to Ukraine. *See* 8 C.F.R. § 1208.16(c) ("The burden of proof is on the applicant for withholding under [CAT] to establish that it is more likely than not that he or she would be tortured if removed to the proposed country of removal.").

Finally, Kyrnuchuk's inability to show any past instances of torture severely undermines his ability to show that any such conduct is likely to occur in the future. Indeed, the only evidence Kyrnuchuk offers to this effect, an affidavit by Professor Louise Shelley, describes Ukraine as suffering from a high level of criminal activity and corruption, but does not sufficiently establish that Kyrnuchuk is likely, in the future, to suffer torture.[3]

## III.

For these reasons, we will DENY the petition for review.

---

[3]Kyrnuchuk also argues that the BIA erred in: (1) affirming the IJ's denial of his February 12, 2005 motion to continue; (2) affirming the IJ's failure to make a record of his decision not to have his expert testify; and (3) requiring him to comply with *Matter of Lozada*, 19 I. & N. Dec. 637 (BIA 1988), for purposes of requesting a continuance based on ineffectiveness of prior counsel. These arguments are rendered moot by our determinations that Kyrnuchuk failed to establish membership within one of the protected classes or eligibility for relief under CAT. Even if the BIA had done exactly as Kyrnuchuk requested, our decision would be the same.