**Jorge Abraham RODRIGUEZ–LOPEZ, Petitioner**

v.

**ATTORNEY GENERAL OF the UNITED STATES.**

No. 08–4224.

United States Court of Appeals, Third Circuit.

Submitted Pursuant to Third Circuit LAR 34.1(a) Feb. 4, 2010.

951

John K. Bleimaier, Esq., Princeton, NJ, for Petitioner.

Thomas W. Hussey, Esq., Glen T. Jaeger, Esq. Paul F. Stone, Esq., United States Department of Justice Office of Immigration Litigation, Washington, DC, Michael B. Mukasey, Esq., Debevoise & Plimpton, New York, NY, for Attorney General of the United States.

Before: SCIRICA, Chief Judge, SMITH and WEIS, Circuit Judges.

## OPINION

PER CURIAM.

Petitioner, Jorge Abraham Rodriguez–Lopez, seeks review of the Board of Immigration Appeals' ("BIA") final order of removal. For the following reasons, we will deny his petition.

### I.

Rodriguez–Lopez, a native and citizen of Guatemala, entered the United States without inspection or parole in November 1990. In January 1993, he filed an application for asylum and related relief in which he claimed that his life would be in danger if forced to return to Guatemala. In an affidavit submitted in support of his application, Rodriguez–Lopez explained that, before he left the country, he had been a student in Quetzaltenango, where he had associated with an anti-government student organization. According to his affidavit, several members of the organization were either assassinated or forced to join the guerrilla army. Fearing for his own life, Rodriguez–Lopez fled to the United States.

In September 1998, Rodriguez–Lopez appeared for a hearing before Immigration Judge ("IJ") Frederic Leeds. After conceding that he was removable as charged, Rodriguez–Lopez voluntarily withdrew his application, apparently because he believed that the political climate in Guatemala had improved. As a result, he was given permission to depart voluntarily before January 23, 1999.

Rodriguez–Lopez did not depart within that period. Rather, approximately six years later, he filed a motion to reopen his removal proceedings in order to file a new application for asylum.[1] The IJ granted

---

1. Rodriguez–Lopez initially moved to reopen the proceedings so that he could apply for labor certification and adjustment of status. When the government opposed the motion on

Rodriguez–Lopez's request and reopened the proceedings.

In Rodriguez–Lopez's second application for asylum, withholding of removal, and relief under the Convention Against Torture (the "CAT"), he again stated that he had participated in a political student group in Quetzaltenango, but this time added that, as a result of his participation, his family members had been threatened, he had been attacked and stabbed with a knife, and a close friend of his in the group had been assassinated. (AR 000503.) According to Rodriguez–Lopez, "some armed group or groups" were still searching for him because of his association with that friend. (AR 000503.)

The parties appeared for a hearing on Rodriguez–Lopez's second application on December 27, 2006. On direct examination, Rodriguez–Lopez's attorney first asked him about the student group he had joined in Quetzaltenango.[2] He stated that the organization performed protests and visited businesses to collect donations for their cause. If a business refused to contribute, Rodriguez–Lopez and other members of the organization would deface the business's property. According to Rodriguez–Lopez, several members of the organization disappeared and were later found dead.

Next, Rodriguez–Lopez told the court that, sometime in 1988, his brother began to receive phone calls warning him that Rodriguez–Lopez was in danger. Then, in September 1989, three men attacked him and stabbed him in the back, nearly killing him. Rodriguez–Lopez stated that his brother continued to receive threatening phone calls for several years after the attack even though he had left the country.

On cross-examination, the government inquired into several inconsistencies in the record. First, the government asked Rodriguez–Lopez why neither one of his applications mentioned that he had collected money for the student organization or that he had defaced property when people refused to contribute.[3] The government also asked him why his second application failed to note that his assault was triggered by these activities. In response, Rodriguez–Lopez explained that "the lawyer never asked [him] about it, the questions that were asked was whether or not [he] had problems in [his] country because of political reasons." (AR 000183.)

Next, the government asked Rodriguez–Lopez why neither one of his applications mentioned that his brother had received threatening phone calls during the time that he was still in Guatemala. Rodriguez–Lopez responded that, "at the moment that [he] was filling out the statement, the declaration, not everything came up in [his] mind." (AR 000185.) The government also asked him why he testified on direct examination that his wife and children had never been threatened, while in his second application, he had stated that his "relatives in Guatemala are still receiving threats to kill [him] and [his] children and [his] wife." (AR 000186.) Rodriguez–Lopez explained that the law-

---

the ground that it was untimely, however, Rodriguez–Lopez stated that he also intended to seek asylum based on changed conditions in Guatemala. *See* 8 C.F.R. § 1003.2(c)(2), (3)(ii).

**2.** On cross-examination, Rodriguez–Lopez clarified that he was not an official member of the organization because he was not enrolled

at the university in which it was based. (AR 000173–178.)

**3.** In an affidavit in support of his second application, Rodriguez–Lopez claimed that his "personal troubles began" after he had been seen posting signs on a wall during a "strike." (AR 000509.)

yer who assisted him with his second application must have misunderstood him.

After Rodriguez–Lopez testified, he presented Professor Frank Lewis Rusciano as an expert on his behalf. Professor Rusciano first told the court about his meeting with Rodriguez–Lopez. According to the professor, Rodriguez–Lopez had conveyed to him that he had been involved in union strikes supported by students at the University of San Carlos; that he had placed posters on businesses that did not support the union; and that he was eventually attacked as a result of these activities. Professor Rusciano also testified about current conditions in Guatemala, opining that the political climate had not improved significantly since Rodriguez–Lopez's departure.

After the hearing, the IJ found that Rodriguez–Lopez was not credible because he had provided conflicting statements and material omissions regarding his political activity in Guatemala. Therefore, the IJ found that Rodriguez–Lopez had failed to demonstrate eligibility for asylum on the basis of past persecution under INA § 101(a)(42)(A). *See* 8 U.S.C. § 1101(a)(42). The IJ further found that he had not established a well-founded fear of future persecution. *See id.* In addition, the IJ held that, because Rodriguez–Lopez had failed to satisfy the asylum standard, he could not satisfy the more difficult standard for withholding of removal. *See Zubeda v. Ashcroft*, 333 F.3d 463, 469–70 (3d Cir.2003). Finally, the IJ concluded that Rodriguez–Lopez had failed to present any evidence demonstrating that it was more likely than not that he would be tortured if forced to return to Guatemala. *See* 8 C.F.R. § 1208.16(c)(2).

Therefore, the IJ denied his application for relief under the CAT as well.

Meanwhile, Rodriguez–Lopez had filed an application for cancellation of removal. Because it had not been properly submitted to the court, the IJ scheduled a separate hearing on the application. The IJ ultimately determined, however, that Rodriguez–Lopez was ineligible for this type of relief because he had not been present in the United States for the requisite ten years before he was served with a notice to appear.[4] *See* 8 U.S.C. § 1229b(b)(1), (d)(1). Accordingly, the IJ entered a final order of removal.

Upon review, the BIA adopted and affirmed the IJ's decision and dismissed the appeal. Rodriguez–Lopez now petitions for review of the BIA's order.

## II.

We have jurisdiction to review the BIA's final order of removal pursuant to 8 U.S.C. § 1252(a)(1). *See Abdulai v. Ashcroft*, 239 F.3d 542, 548 (3d Cir.2001). When, as in this case, the BIA substantially relies on the findings of the IJ, we review the decisions of both the BIA and the IJ. *See Xie v. Ashcroft*, 359 F.3d 239, 242 (3d Cir. 2004). We review these findings, including any credibility determinations, under a substantial evidence standard. *See Cao v. Att'y Gen.*, 407 F.3d 146, 152 (3d Cir.2005). An adverse credibility finding must be upheld unless "any reasonable adjudicator would be compelled to conclude to the contrary." *Berishaj v. Ashcroft*, 378 F.3d 314, 322 (3d Cir.2004) (quoting 8 U.S.C. § 1252(b)(4)(B)).

■ On appeal, Rodriguez–Lopez first argues that the IJ who adjudicated his second asylum application, IJ Frederic

---

4. At the hearing on the application for cancellation of removal, the IJ also permitted counsel for Rodriguez–Lopez to make a closing argument, and submit an additional declaration, in support of his asylum case.

Leeds, erred by "totally disregard[ing] the implicit findings of his predecessor." (Br.13.) Although his argument is somewhat difficult to follow, Rodriguez–Lopez appears to suggest that IJ Leeds, in ruling on the merits of his asylum application, was bound by IJ Strasser's earlier determination that Rodriguez–Lopez had established prima facie eligibility for asylum sufficient to warrant reopening. According to Rodriguez–Lopez, "Judge Leeds should have approved the application for asylum in this case if the facts adduced by the petitioner were consistent with those considered by Judge Strasser when he reopened this matter ... [because t]he prima facie case and the willingness to exercise judicial discretion were already established." (Br.15.)

Rodriguez–Lopez misunderstands the nature of Judge Strasser's decision to reopen his case. Simply stated, the decision to grant a motion to reopen is not a decision on the asylum application itself; to the contrary, the question presented in a motion to reopen is simply whether the evidence "reveals a *reasonable likelihood* that the statutory requirements for relief have been satisfied." *Sevoian v. Ashcroft,* 290 F.3d 166, 173 (3d Cir.2002) (quoting *In re S–V–,* 22 I. & N. Dec. 1306 (BIA May 9, 2000)) (emphasis added). Indeed, the very purpose of a motion to reopen is to obtain a hearing on the merits of the application for asylum. In this case, Rodriguez–Lopez succeeded in establishing prima facie eligibility for asylum, but, after a hearing on his claims, was found to be not credible, and was denied relief. We see no error in this chain of events, and reject the notion that IJ Leeds was somehow bound by findings that IJ Strasser made in connection with the motion to reopen.

■ Rodriguez–Lopez next argues that the agency's adverse credibility determination is not supported by substantial evidence. We disagree, as the record reveals several inconsistencies in Rodriguez–Lopez's story that he could not convincingly explain. Most significantly, although Rodriguez–Lopez testified at the hearing that he was attacked in Quetzaltenango because of his participation in the anti-government student organization, he did not mention this incident at all in his first application for asylum. Given that, as the IJ noted, this attack "really became the heart of" his newly formulated asylum claim, we cannot disagree with the IJ that this inconsistency greatly undermined Rodriguez–Lopez's credibility. See 8 U.S.C. § 1252(b)(4)(B). Therefore, we will defer to the agency's findings. *See Butt v. Gonzales,* 429 F.3d 430, 434 (3d Cir.2005).

Rodriguez–Lopez also alleges that the IJ committed several procedural errors during the December 27, 2006 hearing. First, he claims that Judge Strasser's ruling on the motion to reopen is not part of the record. Contrary to his contention, however, that the administrative record includes the motion to reopen (AR 000521), the government's opposition thereto (AR 000820), Rodriguez–Lopez's response (AR 000764), and IJ Strasser's order granting the motion (AR 000701). In any event, given that, as discussed above, IJ Leeds was not bound by IJ Strasser's interpretation of the evidence presented in the motion to reopen, we fail to see how Rodriguez–Lopez could have been prejudiced by IJ Leeds's alleged failure to review the reopening record.

■ Rodriguez–Lopez's next argument appears to be that IJ Leeds improperly conducted the hearing under the "novel constitutional principle" that the government has a right to due process. (Br.23) This argument is based on the fact that "on at least two occasions Judge Leeds stated that the government had a right to due process!" (Br.23) (citing AR 000126,

000176). Our review of the transcript, however, reveals that, in making the complained-of remarks, IJ Leeds was simply explaining that Rodriguez–Lopez's failure to comply with the court's rules could prejudice the government. (AR 000126, 000176.) Therefore, Rodriguez–Lopez was in no way prejudiced by these remarks, and his suggestion that IJ Leeds attributed rights to the government that it did not have is specious.

■ Rodriguez–Lopez also challenges the IJ's decision to forego closing arguments at the end of the December 27, 2006 hearing. Here too, however, we fail to see how Rodriguez–Lopez could have been prejudiced by this decision. As his attorney conceded at the time, he had presented all of the evidence he wanted, had asked all of the questions he wanted, and had been able to present his expert witness. (AR 000262–63.) In any event, the IJ ultimately allowed counsel to make a summation in support of his applications, albeit at the second hearing. (AR 00076.) Therefore, this argument likewise fails.

■ Finally, Rodriguez–Lopez challenges the BIA's order insofar as it affirms the IJ's decision denying his application for cancellation of removal. Upon review, we agree with the BIA and IJ that Rodriguez–Lopez was not eligible for cancellation of removal because he had not been continuously present in the country for the requisite ten years. *See* 8 U.S.C. § 1229b(b)(1)(A). As the IJ explained, under the "stop-time" provision, 8 U.S.C. § 1229b(d)(1)(A), Rodriguez–Lopez's period of continuous physical presence ended in 1997, when he was served with a notice to appear. (AR 000865.) Although he argues on appeal, as he did before the IJ,

that he never conceded service of the notice to appear, we have held that a strong presumption of effective service of a notice of hearing arises when, as in this case, the notice is sent by certified mail. *Santana Gonzalez v. Att'y Gen.,* 506 F.3d 274, 278 (3d Cir.2007). Because Rodriguez–Lopez failed to present evidence of non-delivery sufficient to overcome that presumption, we see no error in the agency's determination that he did not meet the continuous presence requirement in 8 U.S.C. § 1229b(b)(1)(A).[5]

We have considered Rodriguez–Lopez's remaining arguments and conclude that they are without merit. Therefore, we will deny the petition for review.

---

5. Rodriguez–Lopez also argues that "the weight of authority supports granting asylum in this case," and cites to a number of cases in which Guatemalan citizens have been granted asylum. (Br.26.) Suffice it to say that, unlike Rodriguez–Lopez, none of these petitioners were found to be not credible.